CAMPBELL (PRATT v.). See Case No. 11,-374.

## Case No. 2,366.

CAMPBELL et al. v. RAILROAD CO. et al.

[1 Woods, 368.][1]

Circuit Court, E. D. Texas. March, 1871.

RAILROAD MORTGAGE — FORECLOSURE—PARTIES—INTERVENTION—EFFECT OF DECREE — PRACTICE—JOINDER OF ORIGINAL BILL AND BILL OF REVIEW—FRAUD.

1. It is not necessary that all the holders of the bonds of a railroad company should be made parties to a bill of foreclosure brought by the trustees of a mortgage by which the bonds are secured.

2. Where there are trustees of successive mortgages, and the trustees of a prior mortgage file a bill to foreclose the same, all the bondholders under a subsequent mortgage need not be made parties to the suit in order to make the proceedings valid and binding on all.

[Cited in Young v. Montgomery & E. R. Co., Case No. 18,166.]

3. Where the bondholders secured by a mortgage on a railroad are numerous, it is not necessary to make all of them parties to a suit, or to make any of them parties, if their trustees are parties.

[Cited in Wilmer v. Atlantic & R. Air-Line Co., Case No. 17,776; Kerrison v. Stewart, 93 U. S. 160.]

[See Huntington v. Little Rock & Ft. S. R. Co., 16 Fed. 906.]

4. In a case where the parties are numerous, a suit brought by or against some in behalf of all will be binding on all. The parties who are not named may intervene and make themselves actual parties, so long as the proceedings are in fieri, and are not definitely closed by the course and practice of the court.

[Cited in Wilmer v. Atlantic & R. Air-Line Co.. Case No. 17,776; Omaha Hotel Co. v. Wade, 97 U. S. 21; Osborn v. Michigan Air-Line R. Co., Case No. 10,594; Coann v. Atlanta Cotton Factory Co., 14 Fed. 8; Belmont Nail Co. v. Columbia Iron & Steel Co., 46 Fed. 337.]

5. If the trustees of a mortgage on a railroad are parties to a suit, a decree rendered in the case is as binding on the bondholders secured by it, as if they had been made parties, unless they

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

can show some fraud practiced upon, or connived at, by the trustees themselves.

6. Bondholders secured by a mortgage, if aggrieved by a decree rendered in a suit to which the trustee of the mortgage was a party, can intervene and become actual parties, and then make such application to the court for relief as is competent for parties to make in the same suit; or they may institute such other auxiliary, revisory or supplemental proceedings as a party to the suit might institute.

7. A bill of review may be conjoined with a bill for relief against a fraudulent decree.

8. Trustees named in a mortgage to secure bondholders were made parties defendant to a bill to foreclose the mortgage filed by certain of the bondholders and allowed a decree to be taken by default; held, that this supineness was a constructive fraud against the bondholders whom they represented; and if taken advantage of by the complainants in the suit, to the prejudice of the bondholders, the complainants became participants in the fraud.

9. Where complainants are allowed to dispense with parties on account of their numerousness, any one of whom would have the right to come in by petition, such complainants ought to proceed in the utmost fairness and good faith in procuring a final decree which is to be binding on all.

Bill in equity [by Calvin C. Campbell and another against the Texas and New Orleans Railroad Company and others for foreclosure of a mortgage]. Heard on motion to dissolve injunction, which motion involved the merits of the bill.

Wm. M. Evarts and Wm. G. Hale, for the motion.

Geo. W. Parchal and Sessions, contra.

BRADLEY, Circuit Justice. The Texas and New Orleans Railroad Company, a corporation of the state of Texas, on or about the 1st of November, 1858, executed 1,500 bonds of $1,000 each, and to secure the payment thereof executed two several trust deeds and one mortgage of the same date. By one trust deed the company conveyed to Congreve and Lowery, trustees, 1,200 sections or square miles of the public lands to which the company would be entitled under the laws of the state on the completion of their road, the certificates for which were receivable from time to time, as portions of the road should be completed. By the other trust deed the company conveyed to the same trustees 120 sections of the same lands and so much of its free lands and city lots, etc., as would, with the 120 sections, be valued at $600,000. The special object of this deed was to secure the payment of the interest on the bonds and a sinking fund of two per cent. during the construction of the road. By the mortgage the company conveyed and mortgaged to the same trustees the road bed, right of way, and the whole and entire line of the railroad constructed or to be constructed from the city of Houston to the Sabine river, a distance of 110 miles or thereabouts.

The mortgage had a clause declaring that whenever the company should procure from

the state a certain loan of $6,000 per mile out of the school fund (to which it would by law be entitled on performing certain conditions, and which it was declared the intention of the company to obtain), and should execute to the state its bonds therefor, said bonds should constitute a lien upon the property mortgaged prior and superior to the title and interest of the trustees, the same as if it had been imposed and taken effect prior to the making of the mortgage. The state loan thus provided for was in fact made upon about 70 miles of the road, situated east of Trinity river, to the amount of $430,500, but for the portion of the line between Trinity river and Houston, being about 40 miles, and being the last part of the road which was completed, the state failed to make any loan, but in lieu thereof, for the relief of the company, enacted a law February 7, 1861, entitled "An act for the relief of the Texas and New Orleans Railroad Company," by the second section of which it was enacted that the company should have the power, and it was authorized, to issue a first mortgage upon its railroad from the west bank of the Trinity river to the city of Houston; provided, that the company should relinquish all claims to the state loan on that section of the road. It is sufficiently proved that the road was not completed when this law was passed, and that in pursuance of it the company relinquished all claims to the state loan, and on the 18th of March, 1861, issued 480 bonds of $500 each, being just the amount which the state loan would have been for that 40 miles of road, to wit, $240,000, and executed to Shepherd and Hutchins, trustees, a mortgage on this part of the road and all its appurtenances. The bonds stated on their face that they were issued in lieu of the state loan, and the mortgage refers to the act of 1861, and professes to be the first mortgage on this part of the road by virtue of that act. The bonds thus executed were issued to various parties—contractors and others—and the proof is sufficiently conclusive that they were received for value to the amount of their face, and were negotiated and received as a first lien on that portion of the railroad on which the mortgage given to secure them was laid. These bondholders claim that they are entitled to priority accordingly.

By an act of the legislature of Texas, passed in 1854, every railroad company was entitled to a donation of 16 sections of the public lands of the state for every mile of railroad completed. By this law the Texas and New Orleans Railroad Company became entitled to 1,760 sections, or thereabouts. The two trust deeds of 1858 conveyed only 1,320 sections, leaving 440 sections unincumbered. Whether these sections were embraced in the general terms of the mortgage of 1858 is, perhaps, a question. But it is undoubtedly true that a considerable number of land certificates were issued to various parties for value and are now outstanding, claim-

ed to be free from the lien of any mortgage or trust deed executed by the company. The advent of the late civil war in 1861, and the consequent losses and troubles that ensued, disabled the Texas and New Orleans Railroad Company so that it was unable to pay even the interest on its bonds. These contained a provision that if the interest should not be paid within 90 days after becoming due, the principal should be due and payable, and the trustees should be authorized to take possession of and sell the property mortgaged.

In this condition of things, January, 1868, Charles Moran, Edwin Eldridge and Charles Danforth, three of the holders of the bonds issued in 1858, residing in the states of New York and New Jersey, filed a bill in equity in this court for the foreclosure of the two trust deeds and mortgage given to secure the said bonds, claiming that these securities constituted the first lien on the road and property of the company except that of the bonds issued to the state. They alleged in their bill that it was brought not only for their own benefit, but for that of all other holders or owners of bonds or coupons issued under and purporting to be secured by the mortgage and deeds of trust sought to be foreclosed, who might come in and contribute to the cost and expenses of the suit. They further state that Congreve, one of the trustees, refused to file a bill, and that Lowery, the other trustee, was out of the country. They therefore make these trustees defendants, being citizens of the state of New York. The other defendants to the bill were, the railroad company itself, and Shepherd and Hutchins, the trustees of the mortgage given in 1861. · The giving of that mortgage, and the issuing of the bonds under it, were mentioned in the bill; but the number of the bonds issued or the persons to whom they were issued were alleged to be unknown to the complainants. The bill prayed for the appointment of a receiver, a collection of the assets, a settlement of all priorities, a sale of the road and land certificates and other property of the company, and a distribution of the proceeds according to equity and justice. The Texas and New Orleans Railroad Company and the trustees, Shepherd and Hutchins, filed separate answers to the bill, in which was set up, amongst other things, the priority claimed by the holders of the bonds issued in 1861 on the western forty miles of the railroad. The answer of the company also sets up various defenses to the equity of the bill—that the bonds held by the complainants were unfairly obtained for an amount greatly less than their value, etc.

In November, 1869, before any evidence was taken by either party, an agreement was entered into by certain of the parties by virtue of which a consent decree was made on the 18th of December, 1869, by which it was found there was then due for the principal and interest on the bonds of 1858 the sum of $2,640,600, and on the bonds of 1861, the sum

of $393,600; that the entire property of the company, present and future, was in effect subjected to a lien in favor of the bonds issued in 1858; and that the line of railroad between Houston and Liberty, with the site and lands and other property necessary to its operation, was, in effect, mortgaged and subject to a lien in favor of the bonds of 1861; also, that the company was insolvent, and the road disused and in danger of irreparable injury for want of care and proper repair; that Congreve and Lowery, the trustees of 1858, though they entered an appearance, had never answered or done anything, and a decree pro confesso was taken against them. It was, therefore, decreed that the defendants pay the amount found due by 1st of March then next, or be forever barred and foreclosed of all equity of redemption in the property, and that Josiah F. Crosby, of Houston, be appointed special master to make sale of the property, with direction, in case the money were not paid, to sell all the property of the company, including the entire railroad, fixtures, rolling stock, personal property, lands, land warrants, and all the rights and franchises whatsoever, and that he should report his sale to the court with the name of the successful bidder, and that thereupon the court or judge at chambers would determine how much of the bid should be paid in cash, in order to pay the costs and expenses of litigation and management, and how much in the bonds of the company, and would also determine, if necessary, the relative priority of the two series of bonds. The decree then went on to appoint said Crosby receiver to take possession of all the property, borrow money, and execute bonds therefor which should be a first lien on the road, repair the railroad, procure rolling stock, operate the road; and, if any resistance should be made, to file an affidavit with the clerk, who was thereupon directed to issue a writ of assistance in his behalf. The decree further appointed said Crosby a special master, and Daniel W. Gillett, of New York, a special commissioner to receive proof of the genuineness of the bonds and register the same, and to certify to the court the bonds so proved and registered; and it was decreed that no other bonds should participate in the proceeds of the property to be sold, and that the books should be closed on the 1st of July, 1870.

In pursuance of this decree the receiver took immediate possession of the road and property of the company, except the land certificates (many of which have never been surrendered), and proceeded to make extensive repairs on the road and works of the company, and for this purpose borrowed money and issued his bonds to an amount exceeding, as is alleged, $80,000, and in October last advertised the whole road and property of the company to be sold at the court house in Galveston on the 8th day of December, 1870. Under these circumstances, the bill in this case was filed on the 30th of November, 1870. The complainant Campbell, who was one of the original contractors for building the road, as is alleged, holds 180 land certificates, each for one section of 640 acres, received from the Texas and New Orleans Railroad Company on his contract; also 25 bonds of the issue of 1858, which, with the interest due thereon, amount to $45,800; also 34 of the bonds of 1861, which, with the interest, amount to $32,464, and 4,000 shares of the capital stock of the company of the nominal value of one hundred dollars each. The complainant French holds 60 of the bonds of 1861, which, with interest, amount to $53,760, and by an amendment to the bill, Campbell states that he represents 316 bonds of the issue of 1861, belonging to persons who have agreed to contribute to the suit, and 40 others which he is bound to protect. So that the two complainants represent nearly all, or at least a large majority of the bonds of 1861.

The bill professes to be filed on behalf of the complainants themselves, and all creditors, bondholders, holders of land, and land scrip of the said company and emanating therefrom, as well as unsecured creditors. It makes defendants of the Texas and New Orleans Railroad Company, Shepherd and Hutchins, the trustees of the mortgage executed in 1861, Crosby, the receiver and special master appointed in the former suit, Lowery, the surviving trustee of the securities executed in 1858, and Moran, Eldridge and Danforth the complainants in the former bill. The bill seeks to set aside the decree in the former suit on the ground of fraud in obtaining and entering the same, and because it is inequitable and unjust in ordering a sale of the whole property, in omitting to settle the priorities of the two classes of bondholders, in ignoring the rights of the holders of the bonds issued in 1861, and in making various other erroneous decisions, and seeks to have a new decree made, which shall settle said priorities; a foreclosure of the several mortgages; a sale of the property in such manner as to protect the equities of all parties under the several trusts, and, in the meantime, an injunction against the sale or any further proceedings under the former decree, and the appointment of a receiver. Excuses are given for not appearing and intervening in the former suit, such as absence, ignorance of the proceedings, reliance on the trustees, etc. Upon the filing of the bill and due hearing before me, on the 5th of December last, I granted a preliminary injunction to stop the sale of the property. Separate answers have since been filed by the defendants. Shepherd and Hutchins, the trustees of the mortgage of 1861, of course answer in the interest of the complainants, and admit all the allegations of the bill. The answer of the Texas and New Orleans Railroad Company, by its president, A. M. Gentry, is to the same purport, setting forth more

minutely the transactions upon which the complainants rely. Lowery, the surviving trustee of the bonds of 1858, admits the main facts, but submits the matter to the court, denying, however, that he ever authorized his appearance in the former suit. Crosby, the receiver, says that he has no private or personal interest in the matter, and he sets forth, as required, a schedule of the land certificates which have come to his hands or of which he has received any account.

The answer of Moran, Eldridge and Danforth, the complainants in the former suit (which is sworn to by Moran only), sets forth the views of the contestants in this case. They allege that the decree was entered up in the former case, not by consent, or in pursuance of the alleged agreement, but at a regular hearing of the cause, and they contend that it is not inequitable in any particular; that it does not conclude the rights of the complainants, but leaves them to be settled on further hearing, etc. They admit the execution of the agreement in November, 1869, as stated by the bill, and that it was not carried out; but they allege that the failure to carry it out was the fault of the company and its officers in not complying with the terms of the agreement. Testimony was taken on short notice with a view to a speedy termination of the cause, on final hearing, and the complainants proffer themselves ready for such hearing. The defendants say they are not ready, but move to dissolve the injunction. In view of the stipulations made by the parties, looking to a speedy hearing on the merits, and of the terms on which the preliminary injunction was granted, which were that the complainants should give bond to indemnify the defendants against all damage that might be caused by the injunction if it should be dissolved upon the merits, I think it fair and right that the hearing of this motion to dissolve should be upon the merits, and that the complainants should have leave to refer to all the evidence taken in the case.

The first question raised by the defendants is the propriety of this suit. It is brought to set aside a former decree of this court and to obtain a new decree on the same subject matter, having in general the same end in view, namely, the foreclosure of the mortgage and sale of the property of the Texas and New Orleans Railroad Company to pay the incumbrances thereon. The first suit was brought by bondholders for themselves and all others interested. This suit is brought by other bondholders not parties to the first suit, for themselves and all others interested. The present suit seeks to set aside the decree in the former and to have a new decree on the same matters. At first sight this seems to be an anomalous proceeding. The query at once arises, Will not such a practice lead to endless litigation? What are the principles by which we are to be guided in such cases? It seems to me on reflection, that we need

not be at any great loss to discover a solution of the difficulty. The first suit was or was not defective for want of proper parties. Are all the bondholders of a railroad company necessary parties to a bill of foreclosure, brought by the trustees of the mortgage by which the bonds are secured? Or, where there are successive mortgages, and the trustees of a prior mortgage file a bill to foreclose the same, must all the bondholders under a subsequent mortgage be made parties to the suit in order to make the proceedings valid and binding on all? It seems to me impossible to contend for the affirmative. The rule of chancery pleading which allows some parties to sue or to be sued in behalf of all, where their right is the same and the number is so large as to render it difficult to bring them all before the court, must certainly apply to this case. The very fact that trustees are interposed to receive and hold the mortgage given to secure an issue of bonds, sometimes amounting to hundreds and thousands and transferable by delivery, shows that it is the intent and understanding of all parties, unless the contrary appears, that the trustees are to represent the bondholders in all matters of litigation respecting their common and general rights; and if the trustees fail or refuse to act, any of the bondholders, for themselves and in behalf of the rest, may step forward and put in motion the machinery of the law, making the trustees parties defendant. In my judgment it is not necessary, where the bondholders secured by a railroad mortgage are numerous (as in the case of an issue of several hundred bonds, they will be presumed to be), to make all of them parties to a suit, or to make any of them parties if their trustees are parties. This I regard as the proper general rule, growing out of, and being merely an application of the more general rule, that where parties are exceedingly numerous, and it would be impracticable to join them all without almost interminable delays, and other inconveniences which would obstruct and perhaps defeat the purposes of justice, it is not necessary that they should all be made parties to a suit in equity; but a suit brought by or against some in the behalf of all, will be binding on all. Story, Eq. Pl. § 94 et seq. In such cases the parties who are not named may come in under the decree and take the benefit of it, or show it to be erroneous, or entitle themselves to a rehearing. In other words, they may intervene and make themselves actual parties, so long as the proceedings are in fieri, and are not definitely closed by the course and practice of the court. Id. § 96. In view of this rule, the former suit, brought by Moran and others, was properly framed to obtain a valid and binding decree against all the parties whose interests are now before the court. The complainants in the present suit, holders of bonds issued in 1861, were not personally before the court, it is true; but their

trustees, Shepherd and Hutchins were parties, and their interest was thus properly represented; and the decree rendered in the case was as binding on the bondholders as if they had been made parties, unless they can show some fraud practiced upon or connived at by the trustees themselves. The bondholders, if not parties to the suit, were quasi parties, and had the right at any time to intervene and become actual parties.

The present suit, therefore, must be regarded as a suit brought by those who were quasi parties or privies to the former suit, and who, as such, were bound by the decrees rendered therein, unless they can show some ground for setting aside the decree which could be set up by an actual party to the suit. It is clear, therefore, that the complainants have no right to commence an independent and original suit to foreclose the mortgages of the railroad company. They can only intervene and become actual parties to the former suit, and then make such application to the court for relief as it is competent for parties to make in the same suit; or they may institute such other auxiliary, revisory, or supplemental proceedings as a party to the suit might institute. Does the present suit belong to that category? I am clearly of opinion that it does. It is in essence and effect nothing but a bill of review, conjoined with a bill for relief against a fraudulent decree. These are bills competent for a party in a suit to file, and if both causes are alleged to exist, they may be joined in one bill. A technical observance of the rules of practice would have required a motion for leave to file a bill of review; but this motion is not necessary for filing a bill grounded on fraud in the decree. But as no objection of this kind has been made, it is unnecessary to consider it. My conclusion, therefore, is, that the suit is properly brought. The next question is, Whether the bill and evidence show any good ground for the relief asked? It is contended (1) that the decree sought to be set aside was fraudulently obtained; and (2) that it was, at all events, erroneous and inequitable.

1. Do the bill and evidence show that the decree was fraudulently obtained? The bill alleges that it was a consent decree, entered in pursuance of an agreement executed shortly previous. A copy of this agreement is annexed to the bill. It was signed on one side by the principal holders of the bond of 1858. whose interests were represented by the bill of complaint, including Moran, one of the complainants, and Congreve, one of the trustees; and on the other side by the president and vice-president of the railroad company. It was not signed by the trustees, Shepherd and Hutchins, and in their answer they allege that they knew nothing about it, but considered that they were formal parties, and that the real parties in interest would watch the proceedings, and assert and contest their priorities. From this it is evident,

that so far as the trustees were concerned, they cannot claim that any fraud was practiced on them. They allowed the decree to be taken by default. But this supineness in the matter was really a constructive fraud against the bondholders whom they represented; and if knowingly taken advantage of by the complainants in that suit to the prejudice of the bondholders, they are participants in the fraud. And the present complainants allege that they relied on the agreement being carried out in good faith.

This brings us to the question whether the conduct of the complainants (or those whose interests they represent) in relation to entering up a decree, after making that agreement with the agents of the company, was or was not, characterized by good faith, and free from any just censure. If it was, then the decree cannot be called in question by these complainants; if it was not, the complainants may justly say to them, you took advantage of the gross negligence of our trustees (whom alone you made parties) in not looking after our interests, and you also took advantage of the officers of the company upon whose vigilance we had next a right to rely. Where claimants are allowed to dispense with parties on account of their numerousness, any one of whom would have a right to come in by petition and be made a party, if necessary to protect their interests, they ought to proceed with the utmost fairness and good faith, and not resort to anything like sharp practice in procuring a final decree, which is to be binding on all. Any deviation from this requirement would be a proper ground to be considered on the question of opening or setting aside the decree at the instance of such an omitted party. The court would not tolerate any conduct of the complainants calculated to lull such parties into security and induce them to remit any degree of watchfulness in regard to their interest which they would have otherwise exerted. The defendants, Moran and others, say in their answer in this suit, that the decree in the former suit was not entered in pursuance of the alleged agreement, and was not a consent decree. But the evidence of Mr. Thompson and others is against them on this point, and the very first article of the agreement is, that an agreed decree be entered in the foreclosure suit now pending, directing the sale at public auction of said railroad, its property and franchises. This article, taken in connection with the fact that the decree was signed and entered at the first opportunity after the agreement was executed, and with the evidence on the point, the inference is irresistible, that the decree was signed and entered in pursuance of the agreement, and was a consent decree. This renders it necessary for me to look at this agreement, and endeavor to determine whether there is a reasonable show of evidence to sustain the allegations of the bill, that the complainants in the former case, after getting

possession of their decree, fraudulently evaded the performance of the other stipulations of the agreement.

After the first article relating to the entry of a decree, as aforesaid, the agreement went on to lay down a scheme for reconstructing the company and setting the road in motion. A committee, consisting of Moran and others, was appointed to buy in the road and organize a new company, which was to issue bonds to the amount of $2,700,000, of which $500,000 preferred was to be used for repairs and equipments of the road, and $2,200,000 to be distributed among the holders of the land grant bonds, including $600,000 due the state. The new company was then to issue $1,650,000 preferred 7 per cent. stock, of which $1,250,000 was to be used to pay interest coupons due, and $400,000 to pay the bonds of 1861. Provision was then made for the proportions in which the different parties were to advance money. Moran, before signing the paper, prescribed as a condition that the land warrants for the land, covered by the land grant mortgage, should be duly handed over to the receiver when appointed. Now, it is not pretended that these portions of the agreement have been carried out, but it is in evidence that on the 26th day of July, 1870, at a meeting of the holders of the bonds of 1858, in New York, at which Congreve and Moran were present (1,273 bonds out of 1,500 being represented), it was formally resolved "that the agreement heretofore made with the old officers of the company be considered as void, owing to the failure on the part of the company and its officers to turn over the land certificates and other property in their possession, as stipulated in said agreement, thereby rendering all attempt to reorganize under that agreement utterly useless." Now, if the excuse here alleged for not carrying out the agreement was not the true one; if it was a mere pretense; and if, having got the decree, the complainants in that suit who represented these bondholders, resorted to various shifts and expedients to avoid carrying out the remainder of the agreement, they would certainly have been chargeable with bad faith, and the complainants in this case, who were directly interested in that agreement, would have a just right to complain, and would be entitled to a reversal of the decree and a rehearing upon the merits. This is just the issue which the complainants in the present bill have made, and they have adduced considerable evidence to prove their side of it. If the case were now on final hearing, I should feel it my duty to carefully examine and weigh this evidence as well as that which is offered on the other side to rebut it. But the defendants decline to go into the final hearing at this stage, and aver that they have further proofs to take. This being the position of the case, I think I ought not to dissolve the injunction until the final hearing can be had.

2. But as to the propriety of the decree itself, I am further of opinion, that in any aspect of the case, the demand of the complainants for a settlement of the priorities of the two classes of bonds, before a sale of the property is made, is reasonable. For if the bonds of 1861 should be adjudged to have priority over those of 1858, on the 40 miles of road between Houston and Liberty, then it would be a matter of grave consideration whether the court ought not to decree a separate sale of that portion of the road. It is true the release of the state's claim on that portion by the act of 1861 would place those bonds on an equality with those held by the state, and they might share the proceeds of the whole road pro rata with the state. But it does not appear that the seventy miles of road east of Trinity river, on which the state retained its lien, is equally valuable pro rata per mile with the forty miles west of that river; and then the decree and the notice of the special master under it, both seem to contemplate a sale of all the company's property in lump, including lands and land certificates as well as railroad; and in these neither the state nor the holders of the bonds of 1861 have any interest. So that the decree seems to be irremediably defective. And I cannot see how any evidence, yet to be adduced, can obviate this difficulty, unless it be directed to the primary question of priority between the parties. Though how that question can be materially changed by further proof aliunde, I can hardly imagine.

It is unnecessary for me to examine several other questions presented by the bill, as for example, the title of the holders of the bonds of 1858 to the full amount of principal and interest due thereon. This is a question that can hardly be mooted on a bill of review. Besides, I do not see anything alleged or proven in the case, that goes to show that the holders are not entitled to the entire amount of the bonds. The sale of bonds pledged as collateral, on default of payment of the principal debt, is such a common transaction that it will need specific evidence of fraud to throw suspicion on the title of the purchaser. Nor need I now decide in what manner the receiver shall be reimbursed the expenses made by him in restoring the road to working order and operating it. Being an officer of this court, of course he will be entitled to be protected, and, in some way his expenditures must be paid out of the general proceeds of the company's property; but in what proportion out of different portions thereof, it is not necessary now to determine. Nor do I regard it as necessary to appoint a new receiver. No complaint is made affecting the capacity or fairness of the present receiver. I take it for granted that the parties are still desirous of bringing the case to a hearing at the earliest possible moment, and that without any unnecessary delay, the whole matter will be disposed of as equity shall require.

The motion for dissolving the injunction must be denied.

[NOTE. For decision on hearing for final decree, see Campbell v. Texas & N. O. R. Co., Case No. 2,369.]