## Case No. 4,138.

DUNCAN et al. v. MOBILE & O. R. CO. et al. KETCHUM v. SAME. ZEIGLER et al. v. SAME.

[3 Woods, 567.][1]

Circuit Court, S. D. Alabama. June Term, 1877.[2]

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]
[2] [Affirmed in Ketchum v. Duncan, 96 U. S. 659.

John A. Campbell, J. A. Garfield, Peter Hamilton, and F. N. Bangs, for complainants in the first-named case, and for Alexander Duncan.

George N. Stewart, for the Mobile & Ohio R. Co.

Wm. G. Jones, George Hoadly, E. H. Grandin, and E. L. Andrews, for other defendants and contestants.

Before BRADLEY, Circuit Justice, and WOODS, Circuit Judge.

BRADLEY, Circuit Justice. In the case of the Mobile & Ohio Railroad Company, in which the various suits were consolidated, we have given the subject discussed a good deal of consideration, and have prepared the following opinion: The consolidation of these cases by agreement of the parties has relieved us from the necessity of deciding between the conflicting claims of the two sets of trustees. Both being before the court, as well as the parties beneficially interested, we can make a decree by which a sale of the mortgaged property will be valid, and confer a good title. We are also relieved from making any adjudication in reference to the claim of priority of the Tennessee substitution bonds, which, by like agreement of the parties, is submitted to the consideration of another court.

The only question of importance remaining in the causes as now consolidated is, whether the interest coupons which became due in May and November, 1874, on the first mortgage bonds, are valid and outstanding securities, entitled to payment out of the proceeds of the mortgaged premises pari passu with the bonds from which they were severed, or even prior to said bonds, or whether they are to be deemed to have been paid and satisfied. The holder of these coupons (they not having been canceled) contends that they were purchased from the original holders thereof, and were not paid, and that by virtue of such purchase he is enti-

tled to the full benefit of the mortgage security, and even to priority of payment over the coupons subsequently maturing, and over the principal of the bonds; and if not entitled as purchaser, that he is at least entitled to be subrogated to the rights of the original holders, as if the coupons had never been paid. The coupons in question were regularly presented for payment at the proper places appointed for that purpose, at or soon after the time when they became due; but the money due thereon was not received by the parties holding the same in the usual manner, at the place of presentment; but, after being examined, they were inclosed in a sealed envelope and indorsed with a memorandum of the number and amount, and returned to the holder or his agent, with directions to present them at some neighboring banking house, where they would get the money. It is claimed that they were not paid by the railroad company, but that Duncan, Sherman & Co. advanced the money on them with intent to hold them as subsisting securities, and that the holders consented thus to dispose of them. Parties contesting the validity of the coupons as an outstanding claim insist that they were in fact paid by the company or with funds procured by it for the purchase, and that the holders did not consent to a sale of them, and that Duncan, Sherman & Co., at all events, are estopped from setting up a claim to them as purchasers.

The right of the contestants to appear and oppose the claim of the present holders of these coupons is questioned. It is said that, having come before the master and proved their own bonds without making objection to the coupons which were also presented and proved before the master, they are now precluded from raising objections to them. The statement is not precisely accurate. One of the contestant bondholders at least did present objections before the master (which objections were adopted and presented by the complainants as trustees of the mortgage), and others have since been permitted to appear as defendants in the cause and file an answer, which they have done, raising the very issue. In addition to this, the trustees of the second mortgage filed an answer disputing the validity of the coupons. We think, therefore, that the issue has been distinctly and properly raised.

In the administration by a court of equity of a common fund subjected to the equal benefit of many creditors, if one creditor objects to the claim of another creditor and succeeds in showing it to be invalid, such claim does not stand good as against other creditors who interpose no objection to it. The opposition of one inures to the benefit of all. It questions the right to participate in the common fund. If the other creditors, not opposing the claim, expressly waive all objections to it as to themselves, and consent that it shall participate, such waiver and consent can only affect the proportion of the fund to which they would be entitled if the disputed claim were excluded. It comes in for a portion of their share by equal participation with themselves. This proposition is so obvious that it needs no argument to support it. Waiver of objections to a claim is no proof of its validity except as against those who make the waiver. The waiver filed in this case, therefore, cannot have the effect of proof that the coupons in question were purchased by Duncan, Sherman & Co., except by way of estoppel as against those who filed it. The questions raised by the contestants, therefore, are properly raised, and must be met; and in considering these questions, it is necessary to inquire into the precise position which Duncan, Sherman & Co. occupied towards the company.

It appears from the evidence that they had for some time previous to May, 1874, been the general financial agents of the Mobile & Ohio Railroad Company, and were interested in its capital stock and its various classes of securities, to wit: First mortgage bonds, second mortgage and other bonds, and also in its floating debt. They made the arrangements for the current funds necessary to meet its various liabilities from time to time; and, in short, may be said to have carried the concern for a considerable period. Wm. B. Duncan, the head of the firm, was for several years a director of the company, and in April, 1874, he became its president, and was invested with the most plenary control of all its financial affairs. By resolutions of the directors, adopted in April, 1874, after Mr. Duncan was elected president, he, as such, was invested with full discretion over the available securities held and owned by the company, in consolidated bonds, convertible bonds, first and second mortgage bonds and stock, and was authorized to sell or hypothecate the same; and the net earnings of the company were pledged for repayment of advances made by him for the purpose of meeting the May interest; and the consolidated bonds were pledged as a security for the floating debt. The truth is, the whole financial operations of the company were under the control and passed through the hands of Duncan, Sherman & Co., both in 1873 and 1874, and up to the time of its open suspension in May, 1875. The resources which thus came into their hands were derived from the earnings of the road, the disposable securities and stock of the company, and the temporary loans that were made from time to time. It appears from the annual report of the company for the year 1874 (the year in question) that its net earnings for that year were $708,000, and the sales of bonds (mostly convertible) amounted to $94,-000, making a total of $802,000. The contestants, in this case, contend that these sums were sufficient to have kept down and paid the interest of the first mortgage bonds and most of the other outstanding bonds of the

company. This is true. The annual interest of the first mortgage bonds (including the Tennessee substitution bonds), was about $730,000, and of all the bonds together, about $880,000.

But there was a large floating debt, which, at the close of 1873, amounted, according to the annual report for that year, to the sum of $1,451,147.77, of which Duncan, Sherman & Co. held about $191,000. They had, during the year, loaned to the company, on its notes, $150,000, which had not been re-imbursed, and the balance due them on general account at the close of the year was over $41,000. This loan was made to enable the company to keep up the payment of its interest and to meet its current obligations. The floating debt was kept along by renewals and by pledging various securities of the company as collateral. During the year 1874 it was reduced about $282,000, and as a part of this reduction Duncan, Sherman & Co. reduced their own debt $174,000, bringing it down to about $17,000. That is, they re-imbursed themselves their temporary loan, with interest, amounting to $160,000, and $14,000 on their general account. The contestants complain that this reduction ought not to have been made, especially so much of it as applied to the debt due to Duncan, Sherman & Co. They say that by the resolution of April, 1874, the earnings of the road were pledged for the May interest (which is the interest represented by one-half of the coupons in question), and that at all events this interest should have been paid. They also insist that the same considerations apply to the November interest. They contend that this was a specific appropriation of these funds, and that Duncan, Sherman & Co., occupying the fiduciary relations towards the company which they did, were bound in equity to carry it out, and had no right to assume the role of purchasers of those coupons. This position will presently be considered.

Besides reducing the principal of the floating debt as before mentioned, the sum of $118,346 was absorbed in paying interest thereon, for the purpose of extending it and preventing the sacrifice of collaterals; the sum of $139,296 was used to pay over-due coupons of the previous year, and $128,000 to pay interest on convertible and other bonds; besides which, some of the assets were uncollected, amounting, in excess of what was realized from those of 1873, to $47,726, and the sum of $45,000 was paid on the Oktibbeha branch. These items together amount to $478,368, and with the amount paid on the principal of the floating debt, made an aggregate of $763,000. Various other claims in judgment, and otherwise, absorbed the balance. It is not pretended that any portion of the bonded interest accruing in 1874 (except as above stated) was paid by the company, unless the payment hereafter mentioned is to be regarded in that light.

The only resources which the company had were actually disposed of as above stated.

In this state of affairs, it was evident that the company was in a failing condition. Its net income from the road (which was its only real resource) was insufficient to pay the interest on its funded debt, to say nothing of the floating debt. The great mass of its property was primarily liable to its first mortgage bondholders. If subjected to an indiscriminate scramble of judgment creditors, the rolling stock and outside property would be sacrificed and scattered, and the whole security would be ruined. What was to be done? The first mortgage bonds were not due, and if the earnings were applied to the payment of the interest accruing on them, the bondholders could not take possession of the property, nor bring a suit for foreclosure. At the same time, other creditors were clamorous for every cent which could be realized. Duncan, Sherman & Co. conceived the idea of purchasing the coupons with their own funds, or funds provided by them for the purpose, perhaps in the hope of preserving the credit of the company until a change for the better should enable it to avoid ultimate bankruptcy. It is evident, moreover, that this would place it in their power, if the resources of the company should continue inadequate to redeem the coupons, to take proceedings for administering on the property for the protection of the bondholders, and of putting the company into a course of liquidation. The mode of carrying out the plan of purchasing the coupons was this: Funds were furnished, or provided for, by Duncan, Sherman & Co., in some bank near the usual place of payment, for the purpose of taking up the coupons on their account. When presented for payment by the holders, the course pursued is stated by the master in his report, as follows:

"As to the mode and manner the evidence is very complete. For instance, the couponholders who presented them for payment at the company's office in Mobile, were handed back their coupons after they had been verified or counted by the treasurer or his assistant, and placed in envelopes indorsed with memoranda of the number and amounts, and the holders were told to take them to the Bank of Mobile, where they would be paid. On presentation at said bank to the teller, the coupons were retained by the bank officer and the bank's cheques or money were given for them. The mode and manner of payment in London and New York was not the usual mode. In London the coupons for May, 1874, were taken up on instructions from Duncan, Sherman & Co. by the Union Bank, and for November by the Credit Foncier. In New York, the evidence is that they were not paid in the usual manner, and that the holders were informed that they were being purchased, and held uncanceled. * * *

"Evidence was adduced to show that a portion of the original owners did not know that the company was not paying. It appears that some did not know, and did not inquire. Others did and were fully informed. Payment was not made at the treasurer's counter as usual. It appears that all who inquired were informed of the nature of the payment. There was evidence to show that a written notice was posted up in view of the treasurer's office. The evidence is full that the purchasing agencies and the officers of the company fully understood the transaction. Evidence offered to show that the matter was kept secret, failed."

The master further finds. as follows: "The proof is full as to the intent of Duncan, Sherman & Co., and their agents—the Bank of Mobile, Credit Foncier, etc., with the assent of the company, not to pay or satisfy said coupons so as to extinguish them; but, on the contrary, their plainly expressed intention was that they should be purchased and remain uncanceled, with all the rights that purchasers would have. Their taking up the coupons without extinguishment was with the consent of the company, by the express agreement with its officers that they were to be purchased with all lien rights as existing mortgage security, preserved and held until the company could pay them."

These findings of fact have been excepted to by the contestants, but after a careful examination of the evidence, we think they are substantially correct. Now, upon this state of facts several questions arise:

First. Were Duncan, Sherman & Co. precluded from purchasing the coupons by the relation in which they stood to the company? We do not see that this can be successfully maintained. As financial agents of the company, and general managers of its pecuniary concerns (Wm. Butler Duncan being the chief executive officer), it is undoubtedly true that they were bound to preserve entire good faith. Had they been furnished by the company with the requisite means to pay the coupons, it would have been acting in bad faith towards it to have purchased the coupons in this manner, without the company's consent; and, under such circumstances, even to have purchased them with its consent. and kept them on foot, for the purpose of getting possession of the company's property, would have been a fraud upon other parties interested in that property. But the requisite funds were not furnished by the company. Money enough was furnished, it is true, to have paid these particular coupons, by leaving everything else unpaid. But the company was overwhelmed with floating debt, and creditors were pressing to be paid. Securities to a large amount had to be pledged as collateral to prevent instant prosecution, and debts had to be extended by payment of interest to prevent the sacrifice of the securities. Duncan, Sherman & Co. cannot justly be condemned for paying these pressing obligations as far as the money in their hands would go. Immediate bankruptcy would have resulted from a contrary course. It is true, the resolution of April pledged the earnings of the road for the advances obtained by the president for the purpose of meeting the May interest; but this pledge was only made for his security, and did not prevent him from paying other debts with such earnings if he found it expedient, and for the company's interest to do so. And, even if the company could have insisted on such an appropriation, it did not, but assented to his purchasing the coupons instead of paying them.

As to Duncan, Sherman & Co. paying their own temporary loan to the company, it does not appear but that they had claims of the highest equity to be paid. They had made this loan to enable the company to pay its interest. It was a confidential debt for a loan made to relieve the company from its pressing embarrassments.

Secondly. Was the transaction, as it actually occurred, a purchase of the coupons? It is insisted by the claimant that his possession of the coupons uncanceled is prima facie evidence of his title to them, with all the rights of a purchaser. So it would be if the evidence did not disclose the exact nature of the transaction. Whilst he has possession we know how he got that possession, or, rather, we know how Duncan, Sherman & Co. got it, and it was conceded that the present holder, having obtained them after maturity, is affected by the consequences that attach to the transaction. If they were paid, he cannot hold them as unpaid. He has the same title to them which Duncan, Sherman & Co. acquired, and no greater. Then was it a purchase? We are clearly of opinion that there was no purchase, unless there was an intent on the part of the original holder to sell. This is almost a self-evident proposition. And where, as in this case, a sale, as compared with payment. is prejudicial to the holders' interest by continuing the burden of the coupons upon the common security, and lessening its value in reference to the balance of the debt, the intent to sell should be clearly proved. Such an intent may be inferred, however, when the holder has actual notice that purchase, and not payment. is being made, and when having such notice, he consents to take his money. So the same result will follow if the holder acquiesces in the transaction, on being subsequently informed that payment was not made by the debtor company, but was made by a third party intending to purchase the coupons and keep them, subsisting and uncanceled. In such case the holder would undoubtedly have a right to repudiate the transaction, and demand possession of his coupons by returning the money received for them. But, not doing this, he will be presumed to acquiesce in their transfer.

In the present case many of the parties had actual notice of the nature of the transaction, and all who inquired were informed in relation to it. The circumstances of the payment were calculated to excite inquiry. The coupons were not paid in the usual manner, by the officers or agents of the company, at the place designated for payment; but, after examination, were sealed up in an envelope, and the holder was directed to go elsewhere to get his money. At the place to which he was directed to go he received it, and delivered up his coupons. They were not delivered up to the company. This was an indication that they were not to be canceled. The great advantage to the holder of payment by the company would have been the cancellation of the coupons, so as to diminish the burden on the mortgage security. But he delivered his coupons to a third party, who furnished him the money for them. He ought to have known that that party, whether the bank itself, or some person by whom it was employed, and furnished with funds, would at least keep the coupons for its security until the company could pay them.

We think that this was notice to the holder, at least sufficient notice to put him upon inquiry. It may not have been, and we think it was not, sufficient notice to bind him absolutely to a contract of sale. He might still have repudiated the transaction by returning his money. But it was certainly sufficient to put him upon inquiry; and his subsequent acquiescence confirmed the title of Duncan, Sherman & Co., whose money he received. Had any other parties than Duncan, Sherman & Co. placed themselves in the gap as they did, and taken up the coupons with their own funds, hardly a doubt would have been raised as to their title to keep the coupons until they were re-imbursed. In our judgment, therefore, Alexander Duncan, who obtained the coupons from Duncan, Sherman & Co., is justly entitled to hold them as subsisting demands against the mortgage security.

But the claim put forward, that these coupons are entitled to priority over the principal, and over coupons subsequently maturing, we regard as utterly untenable. This would be giving to coupons a far greater sanctity than justly belongs to them. They are created as a mere matter of convenience for collecting the interest. According to them, the additional quality of being severed from the bond, and of being passed from hand to hand, does not clothe them with any additional privileges prejudicial to the bond itself. They have no preference or priority over it, any more than unpaid installments of interest would have if there were no coupons to represent it. They all stand, as to the security, on the same platform of equality with the principal, unless the mortgage or deed of trust contains some provision to the contrary, which is not the case here (Dunham v. Railway Co., 1 Wall. [68 U. S.] 254); and this is so whether the principal is due or not. It is

suggested that the holder of the coupons may cause the mortgage to be foreclosed and the property to be sold to obtain payment. But he cannot do this to the prejudice of the principal. He must bring in the bondholders who are equally entitled to the benefit of the common fund. The latter are not obliged to stand by and see the entire security taken from them at the instance of the owner of the coupons. Where a common fund is equally liable as a security for various claims, it can only be administered for the benefit of all; and this, whether they have all matured or not. It is true, the bondholders themselves, when they have not parted with their coupons, or when an installment of interest or principal not represented by coupons, is due, may foreclose and sell the whole security for the satisfaction of the amount due, and thus deprive themselves of security for the residue of the debt. But that is because the matter is all in their own discretion, and no other person is injured by their acts. But it does not follow that the holder of separated coupons can do likewise. Equity will not allow him to pursue the entire security, or any part thereof, to the prejudice of other parties equally interested in it.

The conclusion to which we have come as to the right of Duncan, Sherman & Co. to hold the coupons by purchase, renders it unnecessary to discuss the question of subrogation, so ably argued by counsel. Whilst we are inclined to think that, as holders of junior securities, Duncan, Sherman & Co. would have been entitled to pay the coupons, and hold them by way of subrogation, we are not prepared to concede that this would have placed them on equality with the bondholders. No one can deprive the creditor of his security, or any part of it, without his consent, until his whole debt is satisfied. Sureties and others entitled to the privilege of subrogation, paying only part of the debt, must be postponed to the creditor until they are in a position to demand all his securities.

We observe that many exceptions have been taken to the report of the master and to his rulings, in the course of the examination before him, which we have not yet mentioned. We have examined these exceptions, however, but from the view of the case which we have taken, we do not consider them to be material.

A decree should be rendered in the cause in conformity with the views expressed in this opinion, that is to say, that Alexander Duncan is entitled to come in on an equal footing with the first mortgage bondholders for the amount of the first mortgage coupons held by him, including in the term "first mortgage bonds," all bonds which are ranked by the master in his report as belonging to the category of first mortgage bonds, such as ten year interest bonds, etc., so far as they represent coupons actually unpaid, excepting, however, the Tennessee substitution

bonds, which are not passed upon by us, and are not to be affected by the decree, but which are to take their rank of priority according to the decision of the court which has cognizance of the controversy relating to said bonds; also, that the mortgaged premises should be sold as an entirety to pay and satisfy, first, the said first mortgage bonds and coupons, and then the other securities of the company in the order reported by the master, saving and excepting the rights of the holders of the Tennessee substitution bonds, as before provided. Also, that masters should be appointed to make the said sale and to execute the decree; and that the sale should be duly advertised by them, and fixed to take place on a day named; and that, upon such sale being made, first mortgage bonds and first mortgage coupons should be received in payment in place of cash, when tendered for that purpose, except a sum sufficient to pay the costs and expenses of the various litigations, and the expenses and compensation of the commissioners, reserving for further order the status of the said Tennessee substitution bonds, in respect to said sale. Provision should also be made in the decree for executing all proper deeds and conveyances necessary to perfect the title; and all further equities and directions necessary to be made between the parties, or with regard to the mortgage fund, are to be reserved at the foot of the decree. The counsel of the complainants in the original suit will prepare a draft of the decree, and submit it to the opposite counsel, before presenting it to the court, in order that if the terms be not agreed on they may be then settled.