### LOW et al. v. BLACKFORD et al.

#### (Circuit Court of Appeals, Fourth Circuit. May 3, 1898.)

#### No. 246.

1. MORTGAGES—PROVISIONS BINDING UPON BONDHOLDERS.

A mortgage and the bonds and coupons secured thereby are to be construed as one contract, and provisions in the mortgage as to the method of distribution of the proceeds in case of foreclosure sale, although not found in the bonds, will bind the bondholders where there is nothing in the bonds inconsistent therewith.

2. SAME—FORECLOSURE SALE—DISCRETION OF COURT.

Where a mortgage is foreclosed in equity, the court is not bound to decree a sale in strict accordance with the terms prescribed in the mortgage for the execution of the power of sale therein contained, but should exercise a sound discretion, having due regard to the interest of all parties.

3. SAME—METHOD OF SALE—APPORTIONMENT OF PROCEEDS.

Where a single mortgage, given by a railway company to secure three series of bonds, each of which constituted a first lien upon one of the three divisions of the road, and a second lien upon the other two, was foreclosed in equity, *held*, that the three divisions should not be sold separately, nor should the property be offered both in separate divisions and as an entirety, and the most advantageous bid accepted; but the entire property should be sold as an entirety, and the proceeds apportioned among the bondholders of the three classes according to the relative value of th · three divisions as found from the evidence. 82 Fed. 344, affirmed.

Purnell, District Judge, dissenting.

Appeal from the Circuit Court of the United States for the Eastern District of North Carolina.

Charles Steele, for appellants.

Cowen, Cross & Bond, for appellees Wm. H. Blackford and others.

Turner, McClure & Rolston, for appellee Farmers' Loan & Trust Co.

R. O. Burton and Watson & Buxton, for appellee John W. Fries.

George Rountree, for appellee W. A. Lash.

Before GOFF, Circuit Judge, and BRAWLEY and PURNELL, District Judges.

GOFF, Circuit Judge. The Farmers' Loan & Trust Company, trustee, instituted this suit in the circuit court of the United States for the Eastern district of North Carolina in March, 1894, for the purpose of foreclosing the first mortgage, dated June 1, 1886, executed by the Cape Fear & Yadkin Valley Railroad Company. The Mercantile Trust Company of Baltimore, the trustee in the second mortgage, known as the "consolidated mortgage," dated October 1, 1889, was made a party defendant, and subsequently, when it resigned its trust, William A. Lash was substituted as trustee under the mortgage and as defendant in the suit. A cross bill was filed by said Lash

as trustee of the second or consolidated mortgage, in which he prayed that it also might be foreclosed. The first mortgage covers all of the railroad lines except the branches, while the second or consolidated mortgage embraces all of the lines in the first, and also includes the branch lines. The first mortgage is given to secure three separate series of bonds, designated, respectively, as "Series A," "Series B," and "Series C" bonds. Each series of bonds has a first lien upon a certain designated division of the railroad and a second lien upon the other two divisions. The main line from Wilmington to Mt. Airy is 248¼ miles long. Division A is that portion of the road which lies between Greensboro and Fayetteville and Fayetteville and the South Carolina line, about 144 miles in all, of which 46¾ miles is made up of the line from Fayetteville to the South Carolina line. On this division Series A bonds are a first lien, and they are also a lien in common with Series C bonds, but subordinate to Series B bonds, upon that portion of the road situated between Greensboro and Mt. Airy, and also a lien in common with Series B bonds, but subordinate to Series C bonds, on that portion of the road between Fayetteville and Wilmington. Division B is that portion of the road situated between Greensboro and Mt. Airy, about 70 miles in length. On this division Series B bonds are a first lien, and they are also a lien in common with Series C bonds, but subordinate to Series A bonds, upon that portion of the road which lies between Greensboro and Fayetteville and Fayetteville and the South Carolina line, and also a lien in common with Series A bonds, but subordinate to Series C bonds, on that portion of the road between Fayetteville and Wilmington. Division C is that portion of the road between Fayetteville and Wilmington, about 81 miles in length. On this division Series C bonds are a first lien, and they are also a lien in common with Series B bonds, but subordinate to Series A bonds, on that portion which lies between Greensboro and Fayetteville and Fayetteville and the South Carolina line, and also a lien in common with Series A bonds, but subordinate to Series B bonds, on that portion of the road located between Greensboro and Mt. Airy.

The Cape Fear & Yadkin Valley Railway Company is the successor to the Western Railroad Company, a corporation created by the act of December 24, 1852, passed by the general assembly of North Carolina. That portion of the Cape Fear & Yadkin Valley Railway now known as "Division A" had been constructed and operated by the Western Railroad Company. Those parts of the road now called Divisions B and C were built by the Cape Fear & Yadkin Valley Railway Company, whose corporate existence dates from March 1, 1879. It also constructed a number of branch lines in aid of both its local and through business, now known as the "Factory Branch," the "Madison Branch," the "Granite Branch," the "Furnace Branch," the "Aldrich Quarry Branch," and the "Buff Quarry Branch." The South Carolina Pacific Railway, which is 10½ miles long, running from Bennettsville to the North Carolina line, has been leased, and is now operated by the Cape Fear & Yadkin Valley Railroad Company. On the day that the bill was filed in the court below, John Gill was appointed receiver of the Cape Fear & Yadkin Valley Rail-

way Company, and he has been in the custody and control of all its property, under the orders of the court, from that date. On the 2d day of May, 1894, the answer of said railway company was filed, in which all of the allegations of the bill were admitted to be true. William A. Lash, the substituted trustee under the consolidated mortgage of October 1, 1889, filed his answer to the bill on the 28th day of September, 1894. The receiver of the North State & Improvement Company filed his answer on the 28th of September, 1894, by which it appears that said company is the owner of $1,608,000 par value of the stock of the Cape Fear & Yadkin Valley Railway Company, and also of $1,848,000 of the bonds of said railway company executed on the 1st day of October, 1889, and secured by the second or consolidated mortgage. It is claimed by the receiver that the bonds so held are secured by a first lien upon several of the branch lines of the railroad company, and by a second lien upon all the property of said company, subject only to the lien of the first mortgage. The appellants Charles Adolphe Low, George F. Baker, and William E. Strong, claiming to be a committee of Series A bondholders, asked permission of the court below to intervene, and their request was granted on the 20th of December, 1895. These petitioners were known as the "New York Committee." The appellees William H. Blackford, William H. Perot, John A. Tompkins, Frank T. Redwood, Basil B. Gordon, and J. W. Middendorf, claiming to be a committee of holders of the bonds of the three different series, asked like permission to intervene, and their petition was also favorably passed upon by the court. They are called the "Baltimore Committee." The contention of the New York committee was and is that the railroad should be offered for sale, both by divisions and as an entirety, and the most advantageous offer accepted; while the claim of the Baltimore committee was and is that it should be sold as an entirety. The case, having been duly matured, came on to be finally heard, when the court below directed that the Cape Fear & Yadkin Valley Railway, it appearing that it was in default and insolvent, should be sold at public auction as an entirety, and that the proceeds of sale should be apportioned among the bonds as follows: To Division A, 55 per cent.; to Division B, 19 per cent.; to Division C, 19.4 per cent.; and to the bonds having the first lien on the branches, 6.6 per cent. This method of division was found by the court below from the master's report and from the testimony of a number of experts filed therewith, who had carefully examined the road, its reports, receipts, and disbursements. So far as the questions raised on this appeal are concerned, it is not deemed necessary to refer to the other provisions of the decree of sale, which bears date March 31, 1897, and from which the appeal we are now considering is prosecuted.

The first assignment of error is in these words:

"Because in and by said decree of March 31, 1897, the proceeds of the sale of the premises covered by the first mortgage of June 1, 1886, therein directed, are ordered to be distributed first to the payment of the coupon interest of the several series of bonds mentioned in the said decree in preference and priority to the principal of said bonds."

The part of the decree on which this assignment is based, provided that the portion of the proceeds of sale allotted to Series A bonds should be distributed as follows:

"First, to the payment of the coupon interest, which may be due on each of said outstanding Series A bonds (including interest on said coupons), if said amount be sufficient to pay the same, or, if not sufficient, then to the payment of the same pro rata; and after the full and complete payment of said coupon interest as aforesaid, then to the payment of the principal of said Series A bonds, if sufficient to pay the same in full, and, if not sufficient to pay the same in full, then to the payment of the same pro rata."

The decree also in like manner provides for the distribution of the allotment made to the Series B bonds and to the Series C bonds, directing in each case that the principal of the bonds shall be paid only after the coupon interest, with the interest thereon, has been paid in full. The mortgage provides that the proceeds of the trust fund in case of a sale of the railroad shall be applied first to the payment of interest, and then to the payment of the principal of the bonds. No such provision is found in the recitals of the bonds, and the claim of the appellants in this regard is that the terms of the bonds must control, and that they are not to be affected by inconsistent statements found in the mortgage. As a matter of fact, is there anything found in the mortgage inconsistent with or contradictory of the provisions of the bonds? We think not. The provisions found in the mortgage, not included in the bonds, are not contradictory of the latter, but supplemental thereto. And it is well established that in cases of this character the bonds, coupons, and mortgages are to be read together, and construed as constituting one contract; and if the bond refers to the mortgage, as in this case, then the holder of the bond will be presumed to be aware of the terms of the mortgage. Thomp. Corp. §§ 6075, 6110; Manufacturing Co. v. Howard, 28 Fed. 741; Gregory v. Marks, 8 Biss. 44, Fed. Cas. No. 5,802; Stanton v. Railroad Co., 2 Woods, 523, Fed. Cas. No. 13,297; Skiddy v. Railroad Co., 3 Hughes, 320, Fed. Cas. No. 12,922; Caylus v. Railroad Co., 10 Hun, 295, affirmed 76 N. Y. 609; McMurray v. Moran, 134 U. S. 150, 10 Sup. Ct. 427. Each of the bonds secured by the mortgage referred to in this case contains the following, differing only as to the series to which they respectively belong:

"This bond is one of Series A, issued under, secured by, and subject to all of the provisions of a first mortgage executed by the said railway company to the said the Farmers' Loan and Trust Company, bearing even date herewith, to which said mortgage reference is hereby made for the more detailed provisions thereof."

This provision of the foreclosure decree is founded on the direct and positive terms of the mortgage itself, which are usually adopted by the courts in cases where the trust or contract provides for it. It is not uncommon in such decrees to direct that the proceeds of foreclosure shall be applied to the payment of coupons which matured before a general default in preference to the bonds from which they were taken, if there is nothing in the mortgage requiring a distribution in another and special manner. If the deed of trust or mortgage provides that the interest coupons must be paid before the principal of the bonds, then the decree will be so drawn. Stevens

v. Railroad Co., 13 Blatchf. 412, Fed. Cas. No. 13,406; Cutting v. Tavares, 23 U. S. App. 363, 9 C. C. A. 401, and 61 Fed. 150; Burke v. Short, 24 C. C. A. 422, 79 Fed. 6; Railroad Co. v. Fosdick, 106 U. S. 48, 1 Sup. Ct. 10. It is, therefore, well established that the manner of distributing funds realized from the sale of property under foreclosure proceedings is to be determined from the terms of the mortgage. In cases where it has been held that the proceeds shall be divided ratably between the bonds and the past-due coupons, reference has been made to the mortgage to show that no requirement to the contrary is contained therein. Duncan v. Railroad Co., 3 Woods, 567, Fed. Cas. No. 4,138; Ketchum v. Duncan, 96 U. S. 659, 671; Dunham v. Railway Co., 1 Wall. 254. The case of Duncan v. Railroad Co., above referred to, and relied upon by counsel for appellants, is not in conflict with the views we now express, although it was there held that the overdue coupons were not entitled to priority in payment over the principal of the bonds. It is clear that the court reached the conclusion announced in that case because the mortgage contained no provision giving preference to the interest coupons. It may be well to quote in this connection the terms of the mortgage relating to this matter, which are as follows:

"And after deducting from the proceeds of such sale proper allowances for all expenses thereof, including attorney and counsel fees, and all other expenses which may have been by it incurred, as well as reasonable compensation for its own services, it [the trustee] shall apply the residue of the proceeds of sale to the payment, first, of the interest due on the said bonds outstanding secured, or intended to be secured, hereby, and, secondly, of the principal of said bonds in full, if the said purchase money, after deducting the expenses above mentioned, be sufficient; but, if not, then pro rata."

We find no error in the decree complained of, so far as the questions raised by the first assignment of error are concerned, and we now proceed to the consideration of the next, which is in the following words:

"Because the said decree of March 31, 1897, directs the sale of the mortgaged premises therein described only as a single parcel and an entirety, and not in divisions, and further directs that the proceeds of such sale be divided among the holders of the several series of bonds therein mentioned according to the percentages fixed by the court and specified in said decree."

This brings in review by this court not only the conclusion reached by the court below to sell the railroad as an entirety, but also the relative value of the different liens as found and established by that court. Is the contention of the appellants that under the terms of the mortgage they are, as holders of bonds secured thereby, entitled to a separate sale of each division of the road, or to have it offered for sale as an entirety and then in divisions, according to "the double method of sale," well founded? The first mortgage was made to secure three different series of bonds. That it does so, and that it is a valid mortgage, we have no doubt. Two mortgages were authorized by the stockholders at a meeting of the same held May 6, 1886, the details to be arranged by the board of directors, covering the entire property and franchises of the company. The first mortgage covering the property owned by the company in existence at the date of the same was to secure bonds to the amount of $10,000 per mile

upon the road then constructed and to be thereafter constructed, and the bonds were to be divided into three series, the liens of the same to attach as the board of directors should determine. The second mortgage was also to be upon the entire property,—an income mortgage to the amount of $5,000 per mile. The board of directors, at their meeting on May 6, 1886, passed, among others, the following resolutions:

"First. That this company make and execute a first mortgage upon its franchises and entire property, as is more particularly hereinafter described, to the Farmers' Loan and Trust Company of New York, and issue bonds thereunder to an amount not exceeding ten thousand dollars per mile of completed road, which bonds shall be of the denomination of one thousand dollars each, payable in gold coin of the United States of America, and shall be of three series, as is more particularly hereinafter specified. They shall bear date the first day of June, one thousand eight hundred and eighty-six, and shall bear interest from the first day of June, one thousand eight hundred and eighty-six, at the rate of six per centum per annum, payable semiannually at the agency of this company in the city of New York on the first days of June and December in each and every year as evidenced by the interest coupons thereto attached, and shall become due and payable on the first day of June, one thousand nine hundred and sixteen.

"Resolved, secondly, that the property to be conveyed by the said mortgage shall be all and singular the railroad of said company between the Virginia line from the point near Mt. Airy, where the road now being constructed shall intersect that line, via Greensboro and Fayetteville to the South Carolina line, where the road now intersects that line, and also the road from Fayetteville to Wilmington to be hereafter built, now owned or hereafter acquired, together with all sidings, station houses, real estate along the line herein described, and all equipment, tolls, and income thereof, all the corporate rights and franchises of said company, and all other real and personal property to it belonging and appurtenant to the line here described, whether now owned or hereafter acquired; and this mortgage shall be in trust for the benefit and security of the holders of the bonds issued hereunder without preference, priority, or distinction as to the date or time of issue, so that each of such bonds shall have the same security hereunder as though they had all been executed and delivered simultaneously: provided, however, that the said bonds be divided into three series of bonds, that is to say, Series A bonds, Series B bonds, and Series C bonds, and they shall attach as liens upon the property hereby mortgaged in the following manner, that is to say: Series A bonds shall be a first lien on that portion of the railroad which lies between Greensboro and Fayetteville and Fayetteville and the South Carolina line, together with all station houses, sidings, and other property of whatever nature appurtenant thereto; and a lien in common with Series C bonds, but subordinate to Series B bonds, upon that portion of the road now being constructed between Greensboro and the Virginia line via Mt. Airy, together with the property appurtenant thereto; and also a lien in common with Series B bonds, but subordinate to Series C bonds, on that portion of the road between Fayetteville and Wilmington, when the same shall be constructed, together with the property appurtenant thereto. Series B bonds shall be a first lien upon that portion of the road which is now being constructed between Greensboro and the Virginia line via Mt. Airy, together with all station houses, sidings, and other property of whatever nature appurtenant thereto; and a lien in common with Series C bonds, but subordinate to Series A bonds, upon that portion of the road which lies between Greensboro and Fayetteville and Fayetteville and the South Carolina line, together with the property appurtenant thereto; and also lien in common with Series A bonds, but subordinate to Series C bonds, on that portion of the road between Fayetteville and Wilmington, when the same shall be constructed, together with the property appurtenant thereto. Series C bonds shall be a first lien upon that portion of the road between Fayetteville and Wilmington, when the same shall be constructed, together with all station houses, sidings, and other property of whatever

nature appurtenant thereto; and a lien in common with Series B bonds, but subordinate to Series A bonds, on that portion of the road which lies between Greensboro and Fayetteville and Fayetteville and the South Carolina line, together with the property appurtenant thereto; and a lien in common with Series A bonds, but subordinate to Series B bonds, on that portion of the road which is now being constructed between Greensboro and the Virginia line via Mt. Airy, together with the property appurtenant thereto. And in case of a default and foreclosure as is hereinafter provided for, all rolling stock and movable and other property which belongs to the road as an entirety, and is not specially appurtenant to any one of the three divisions of the road hereinbefore made, shall be apportioned among the said three series of bonds in proportion to the amount of such bonds as may be outstanding at the time of such default and foreclosure."

This action of the stockholders and directors was copied into and made part of the mortgage. Other resolutions of the directors, also included in the mortgage, fixed the form of the bonds, and divided them into the series before described. The mortgage then grants in trust the entire railroad from Greensboro to Fayetteville, and from Fayetteville to the boundary line between North Carolina and South Carolina, and from Fayetteville to Wilmington, and also the road then being constructed from Greensboro to the boundary line between North Carolina and Virginia. It then provides for a sale at public auction, by the trustee, of the mortgaged property, in case of default in the payment of interest, and specifically directs the mode of procedure of said sale in the following language:

"The said party of the second part shall, in case of such default as is referred to hereinbefore in this article, upon the written application of holders of one-tenth of the bonds hereby secured or intended to be secured, declare the whole principal sum of all the bonds secured or intended to be secured by this mortgage to be due and payable, whereupon the whole principal sum of each and all of said bonds then outstanding shall forthwith be due and payable. notwithstanding that the time therein limited for the payment thereof may not then have elapsed; and the said party of the second part shall, in that case, upon like security and indemnity, proceed, with or without taking possession, to sell and dispose of at public sale all and singular the said railroad, estate, real and personal, corporate rights, franchises, and premises hereby mortgaged, or agreed or intended so to be, to the highest bidder offering the same first as an entirety; and, in case no acceptable bidder is forthcoming for the said property as an entirety, then the said trustee shall proceed to sell separately the three divisions of the road hereinbefore made, and upon which the several series of bonds are hereby made or intended to be made first liens."

This special direction was to the trustee, and was limited to the sale to be made under the provision of the mortgage last quoted. But the trustee did not act under this clause. The holders of one-tenth of the bonds secured by the mortgage did not ask it to proceed under the same, and therefore, after the default by the railroad company, it sought the aid of a court of equity, filing therein the foreclosure bill usual in such cases. Surely, it will not be seriously contended that this special instruction to the trustee for his guidance in a contingency that, in fact, never happened, is also to be considered as a direction to a court of equity, called upon years after to dispose of the property in such manner as will best protect the interests of all the parties, and guard the equities presented by the conflicting claims that have their existence from causes originating since the mortgage was executed. There is no "iron rule" upon this subject, and while

the general practice is to follow as closely as may be proper the mode of procedure desired by the parties, and as may be set forth in the mortgage, yet still the court must, in its discretion, determine from the facts of each case the manner of sale that will subserve all interests, produce the best results for all concerned, and not enhance the value of one class of securities involved at the cost of another which is equally entitled to its care and protection.

Appellants' claim that the mode of sale provided for in the mortgage is to be exclusive of all others has not been favorably received by the courts, and has met with the disapproval of the supreme court of the United States, which, speaking by Mr. Justice Brown in the case of Guaranty Trust & Safe-Deposit Co. v. Green Cove Springs & M. R. Co., 139 U. S. 137, 143, 11 Sup. Ct. 512, 514, said:

"This clause, however, is open to the objection of attempting to provide against a remedy in the ordinary course of judicial proceedings, and oust the jurisdiction of the courts, which, as is settled by the uniform current of authority, cannot be done. Hope v. Society, 4 Ch. Div. 327; Edwards v. Insurance Soc., 1 Q. B. Div. 563; Horton v. Sayer, 4 Hurl. & N. 643; Scott v. Avery, 8 Exch. 487; s. c. 5 H. L. Cas. 811; Thompson v. Charnock, 8 Term R. 139; Mitchell v. Harris, 2 Ves. Jr. 129; Tobey v. Bristol Co., 3 Story, 800, Fed. Cas. No. 14,065; Noyes v. Marsh, 123 Mass. 286; King v. Howard, 27 Mo. 21; Conner v. Drake, 1 Ohio St. 166; Trott v. Insurance Co., 1 Cliff. 439, Fed. Cas. No. 14,189; 2 Story, Eq. Jur. § 1457."

It is true that the mortgage in that case referred to provided that the method of sale set out in it should be exclusive of all others, but still the reasoning of the court and the authorities cited sustain the conclusion that the parties to a contract cannot, by its terms, deprive a court of equity of its right, in the due course of its proceedings, to adopt such plans concerning the sale of property as the peculiar circumstances of the case before it shall suggest to be proper for the protection of the interests of all the parties. Again, the supreme court in the case of Morgan's L. & T. R. & S. S. Co. v. Texas Cent. Ry. Co., 137 U. S. 171, 192, 11 Sup. Ct. 67, said, referring to a similar provision:

"There was nothing in the mortgages which took away the inherent right of resort to the courts, and this clause did not impart what existed without it; but its insertion, evidently out of abundant caution, made it perfectly clear that the provisions relied on by appellants did not apply to foreclosure by bill in equity, but to the cumulative remedy specified. It is easy to see why taking possession and selling without intervention of the court should be guarded against, and the trustee not be required or allowed to proceed in that summary manner except on the request of a certain percentage of the holders of the bonds. Such proceedings might result in injury, which could not be predicated of those regularly taken in a court of equity. Arbitrary procedure by the trustee was not deemed desirable, in view of the interests of both mortgagor and the bondholders as a class, while each would find the protection to which it might be entitled at the hands of the court. Mercantile Trust Co. v. Missouri, K. & T. Ry. Co., 36 Fed. 221."

It is clear that the trustee in such a mortgage may waive the cumulative remedy provided in it, and apply to a judicial tribunal for a foreclosure; and frequently it is for the interest of all concerned that he should do so. If the court is resorted to, the procedure must be according to the established rules of law, and the chancellor is not bound to direct a sale in strict accordance with the terms of the mort-

gage, but should exercise a sound discretion, having due regard for the rights of the debtor and of all the creditors, respectively. Undoubtedly, there are cases where it will be entirely just and equitable to adopt in the decree of foreclosure the plan of sale suggested by the mortgage, but certainly it will not be error going to the validity of the decree not to do so if the rights of all the parties have been fully recognized and duly guarded.

The court below not being compelled by the terms of the mortgage to sell the railroad by divisions, it remains yet to be ascertained whether or not the direction that it be sold as an entirety was, under the circumstances of this case, the proper exercise of judicial discretion. A connected railroad, one of the length, character, and importance of the Cape Fear & Yadkin Valley, involving as it does such large sums of money to its bondholders and its stockholders, and in which the people of the state to which it owes its existence are so deeply interested, should, if at all practicable, be kept together as one system, and sold as an entirety. The onus is on those who insist that it should be disrupted and sold in parcels to show the necessity for it, and to make it clear to a court of equity that good conscience and fair dealing demands it. Have the appellants succeeded in doing this? Giving due consideration to the facts they have marshaled, and to the arguments submitted in support thereof, we are forced to answer the question propounded in the negative. In proceedings of this character courts will, if at all practicable, regard the railroad as an entirety, will decree it to be sold as such, and will prevent its severance into parcels, even though it may be subject to partial mortgages. Muller v. Dows, 94 U. S. 449; Bank v. Shedd, 121 U. S. 74, 87, 7 Sup. Ct. 807; Railroad Co. v. Lewton, 20 Ohio St. 401; Compton v. Railroad Co., 31 U. S. App. 486, 597, 15 C. C. A. 397, and 68 Fed. 263, 327. We quote with approval the following portion of the opinion of the court below, filed by Judge Simonton, in disposing of the particular point we are now considering:

"The proceedings for foreclosure having been instituted in this court, and a receiver having been appointed, and the time having arrived for a final decree, the first question which is met at the threshold is, how shall the road be sold? In divisions, or as an entirety? How shall the proceeds of sale be apportioned among the several classes of bonds in case, as is more than probable, a sum sufficient to pay the entire sum due, with expenses, be not realized from the sale? This railway company derives all its powers and privileges from the state which created it, and the bondholders enjoy the security of the mortgage, because the act of the legislature granted this power to the railway company. The purpose and intent of the state was to secure an entire line of railway from its principal seaport to the Virginia line. It granted the franchise to the company as an entirety,—one indivisible franchise, granted for the purpose of constructing and continuing an entire continuous line of road. The mortgage is also a single instrument of an entire line intended to secure interest of all bonds and then the principal, giving to each of them as part of its security the franchise of the whole line and an interest in the entire road and its property. Over the action of the trustee, each bond, without distinction, has an equal voice with every other bond. The trustee must see to it that the interest on every bond is paid. One-tenth of all the bonds, without distinction, can secure a declaration that all of the bonds are payable at once, and can require the trustee to enter and take possession of the whole mortgaged property. Every part of the railway property 'is dependent upon and connected with the others, and this interde-

pendence constitutes a part of the value of each of its several parts. Division B, for instance, has a value in its bed, iron, cross-ties, stations, etc. Besides all these, it has a clearly recognized value, because it is a part of a continuous line operated by one set of agents from its western terminus to the sea. The same intrinsic and incidental value exists in each division. If, therefore, the property were offered for sale at auction in separate divisions, it could —probably would—result in a disruption of the entire system, against the purpose of, and defeating the ends sought by, the state, for which the corporation was created, and to which it owes its existence and its powers; will be inconsistent with the general tenor of the mortgage itself; and will utterly destroy an important incident in the value of each division. Besides this, during the operation of this railway as a whole system, it has become possessed of certain property rights secured for the benefit of the whole system. These are, the lease of the South Carolina Pacific, connecting at the South Carolina line, and extending to Bennettsville, South Carolina,—a valuable feeder. If the road be sold in divisions, this connection would be valuable to, and could be purchased by, the purchaser of Division A only, at its own price. From time to time branch roads have been constructed, connected with Division A and with Division B. They are valuable because of this connection, because of this connection only, and are only valuable to the purchaser of the division with which they are respectively connected, who will get each of them at his own price. The franchise cannot be divided. A sale by division would destroy it entirely. It is true that under the statute law of North Carolina (section 1936 of the Code of North Carolina) the purchasers of any railroad can form a new corporation, and, if the divisions are sold separately, each set of purchasers can do this. But the present franchise for a line continuous from the northwestern boundary of the state to the sea would be absolutely lost, unless the road and its property be sold as an entirety. In that case only could the purchasers organize a corporation with this franchise. The rolling stock is used on the whole system. It is not needed by any division separate from the whole. A sale by division would greatly impair its value. Every bond is entitled to its share of the value of each of these items of value. It would be unjust, it could almost be said would impair the obligation of a contract, to deprive any of them of this incident of value. It would, perhaps, be improper, at least premature, to say that this railroad property could not or should not, under any circumstances, be sold except as an entirety; not in divisions. But this course—a sale of the property as a whole—should not be abandoned, if abandoned at all, except as a last resort, after it has been demonstrated that it is not practicable, due regard being had to the rights of the bondholders of each or any class. For the present, under the stress of the reasons given, it is best to exhaust the effort to sell the whole property as an entirety. But if the property be sold as a whole, we are met by a grave problem. How shall the proceeds be apportioned? There is a marked difference in the value of the bonds on each division, and of the real value of each division. Division A meets at Greensboro, one of its termini, the Southern Railway, and at Fayetteville it crosses the Atlantic Coast line. At its other terminus it meets a valuable feeder, the South Carolina Pacific. Division B has fewer advantages, and is less valuable. So with Division C still less. This difference must be ascertained, and the proceeds of sale apportioned. Ordinarily putting up property at auction in open market is the best test of value. This, however, is not the case with railroad property under mortgage. The holders of the bonds control the sale, and can make the price bid suit their views. This is almost the universal experience. The South Carolina Railway Company, at the end of a foreclosure suit involving questions of liens of five orders of priority, was put up for sale, and was purchased by a controlling syndicate of first consolidated mortgage bonds at the upset price of $1,000,000. The purchasers resold it within two weeks for over $5,000,000. It has been suggested that the separate divisions could be put up at an upset price regulated by the money value of their respective bonds as indicated by recent sales. But as there is, and has not been, any great demand for these bonds, their value cannot be fixed by any casual or isolated sales. If this be a safe guide, why adopt the form of a sale when the proportionate value could be fixed by the market value of

the bonds? If an upset price cannot be fixed in this way, there is no way of fixing it without some further information. The practice of this court furnishes a mode of getting such information. Let the special master, E. S. Martin, take testimony, and report facts proved before him as follows: (1) What has been the relative earning capacity of these separate divisions for a period of five years; that is to say, what is the value of the aggregate of freight going over such division between its termini, and the value of its passenger traffic, and what are the necessary operation expenses. (2) What is the cost of repair of its roadbed and track. (3) What is the comparative estimate of the value of the respective divisions by disinterested persons who have had experience in railroads, furnishing such estimate under oath under cross-examination and giving the grounds for the estimate. (4) Any other facts bearing on this question of actual and relative value. Let the report contain only the facts given in evidence, so that the court can reach its own conclusion."

The court must determine from the particular facts of each separate case, keeping in view the rights of the mortgagor and the bondholders, as well as the claims of intervening creditors, and all the equities involved, the method of sale that will produce the best results to all parties in interest. When the court has so found, its decree should stand, unless the wrong and injustice attributed to it is made plainly to appear. Many of the cases reported, involving questions similar to those we are now considering, some of which have been cited and are relied upon by the appellants, are complicated by facts from which this case is free. Here the mortgages cover the entire property, and there is but a single franchise involved. We have here but one corporation, and not several consolidated companies with separate mortgages and various underlying liens upon distinct portions of the road. In such cases the courts have found it proper in some instances to sell separate portions of the road, or to offer it for sale both by divisions and as an entirety, accepting the offer most advantageous to the parties in interest. In other cases such sales seem to have been acquiesced in, no suggestion having been made that any particular interest involved in the suit would be prejudiced by the mode adopted. The case of Union Trust Co. v. Illinois Midland Ry. Co., 117 U. S. 434, 6 Sup. Ct. 809, relied upon by appellants, does not sustain the contention that, where distinct portions of the property to be sold are subject to separate mortgages or liens, that the decree of sale must provide for offering the same both as an entirety and in parcels; but it simply holds that under the circumstances of that case such manner of sale was entirely proper, and just to all parties in interest. That such a decree was rendered in that case is not surprising, and it would have been more than strange if the supreme court had not given it its approval.

Bank v. Shedd, 121 U. S. 74, 7 Sup. Ct. 807, and Gibert v. Railroad Co., 33 Grat. 586, are cases where decrees directing sales as entireties were sustained on appeal, because it did not appear that separate sales would have been more advantageous to the divisional bondholders. In the case we are now disposing of we think it is clearly shown that all of the divisional bondholders will obtain, in the distribution of the proceeds of the mortgaged property, a proportion more favorable to their interests from a sale made as an entirety than they would from one made in parcels and divisions. It might be possible that the holders of one series of bonds may be able, on

account of the peculiar and favorable location of the division of the road on which their lien attaches, to hereafter make most desirable arrangements concerning it for purposes of their own, provided they can secure it at a separate sale; but that is a matter that did not impress the court below, and that will not influence this court in disposing of the questions that directly affect not only the bondholders of that particular division, but those of all other portions of the road. It is true that the appellants do not ask for a sale by division alone, but that the road shall be offered both as an entirety and by divisions, and the most advantageous bid accepted. As the decree appealed from directs a sale as an entirety, and as it would also be offered in that way if the present insistence of appellants should prevail, their idea must be that the sale by divisions will, in the aggregate, realize the greatest sum; and yet there is, in our opinion, an utter failure on their part to show by the evidence that such will be the result. If the sale by divisions should be made to realize more than the sale as an entirety, it can only be accomplished by abnormal bids on Division A, or on that division in connection with Division B, if we are to rely on the values placed on the property by the testimony returned with the master's report, which would result most disastrously to the Series C bonds, causing the holders thereof to depend on that division alone for their payment, destroying, in effect, their liens on Divisions A and B, and depriving them of their interest in the great value of the road as a unit. The court would not confirm such a sale, at least without first readjusting the ratio of apportionment of the proceeds so as to produce relatively the result that will be accomplished by the present decree. The court should not allow, by its decree of sale or by its method of distribution, the relative rights of any of the bondholders to be impaired, be the extent of their interests great or small. In the present contention there is but one mortgage, one railroad, and one franchise, but there are three series of bonds, differing greatly in value because of the location and intrinsic worth of the separate sections of the road by which they are secured, the least valuable being made still less valuable by the effort to debar them of the right to participate in the benefits to be derived from the sale of the mortgaged property as a whole. And this is to be effected, if at all, on the claim that the Series A bondholders are entitled to a separate sale of that division, not only as a matter of equity practice, but also under the terms of the mortgage. In our opinion, neither the practice referred to nor the contract mentioned will justify this court in directing a mode of procedure that will evidently produce injurious results to one set of bondholders, even if it causes desirable consequences to another.

In Campbell v. Railroad Co., 1 Woods, 368, Fed. Cas. No. 2,366, cited by appellants as a notable instance of the sale of separate divisions of the same road, the court (Mr. Justice Bradley on the circuit), while so holding under the peculiar facts there presented, took occasion nevertheless to say that:

"Cases often occur when a sale of the property out and out, and a subsequent adjustment of claims upon the fund, is the only just method which can be pursued. But whenever a specific property on which a separate incum-

brance exists can be sold separately, *without injury or sacrifice of that or other property*, it ought to be thus sold, so as to secure to every incumbrancer, if practicable, the right of protecting his security without involving himself in onerous engagements, or being subjected to onerous conditions."

This conclusion of that eminent jurist, far from being overlooked or disregarded by us, has aided us materially in our investigation of this case, and his words that we have placed in italics have had much to do in aiding us in reaching the result we now announce. Concluding, as we do, that a sale by divisions would, under the circumstances of this case, be inequitable, it follows, we think, that the "double method" insisted upon by the appellants would be improper, for the reason, among others, that, as the court would not confirm a divisional sale, the bids could only be used as a mode of ascertaining the relative values of the different interests, for which purpose they would, in our opinion, for the reasons already given, be useless.

The duty of the court in directing the method of sale in a case like this is both difficult and delicate. The interests appealing to it, each and all of them entitled to the same careful consideration, are many and conflicting. Here is a struggle between the holders of the three series of bonds, a contest as to a part of the property between those claiming under the first mortgage and those under the consolidated mortgage, an effort by the bondholders under the latter to save from the general wreck some little part, if possible, of their unfortunate investments, and here also, in submission to the court's decree, are the interests of the mortgagor and the rights of the public.

An extended discussion of the question of the valuation of the several divisions of the road, of the different branches, and of the interest of the Cape Fear & Yadkin Valley in the South Carolina Pacific Railroad, as shown by the master's report and the evidence returned with it, is not deemed essential by us. The matter was carefully examined by the court below, after full argument by counsel, and the values then fixed and the apportionments then made will not be disturbed by this court. Our investigation has involved the study of the master's report, including the testimony filed therewith, and the application of the same to the conceded facts of this case, and we reach the conclusion that the method adopted by the court below for the distribution of the proceeds of sale is one that, if it works injustice to the appellants, neither they, with their financial experience, nor their counsel, with all their legal ability, have been able to point out.

The assignments of error not specifically referred to have been in substance disposed of in the discussion of the general questions involved herein.

Counsel, in their oral arguments and on their briefs, discussed the proper construction, as well as the constitutionality, of the act of the general assembly of North Carolina of the 8th day of March, 1897, entitled "An act to amend section 698 of the Code," but we have not found it necessary to consider that legislation in connection with the questions raised in this case. The decree appealed from is affirmed.

PURNELL, District Judge (dissenting). I concur in the reasoning and conclusion that the coupons of the bonds must be paid before

the bonds themselves, but cannot concur in the conclusion as to the method of sale. The holders of the different series of bonds, and especially of Series A, have never accepted the terms of the mortgage of 1889, and their rights must be adjudicated under the terms of the mortgage of 1886. Since the adoption of the state constitution in 1868 the policy and law of North Carolina in regard to corporations has been materially changed. Charters granted prior to 1868 were held to be contracts, which the legislature could not change without the consent of the corporation. In Mills v. Williams, 33 N. C. 561, Pearson, J., afterwards chief justice, speaking for the supreme court of the state, in a very learned opinion, after stating the differ ence between public and private corporations, says:

"The expectation of benefit to the public is the moving consideration on the one side, and that of expected remuneration for the outlay is the consideration for the other. It is a contract, and, therefore, cannot be modified, changed. or annulled without the consent of both parties."

This is in accord with many decisions of the supreme court of North Carolina and of the supreme court of the United States, following the decision of the latter court in the Dartmouth College Case, 4 Wheat. 518. The same doctrine is held in Railroad Co. v. Reid, 13 Wall. 264, which was a writ of error from the supreme court of the state reversed by the supreme court of the United States. The constitution since 1868 (article 8, § 1), reserves to the state the right to alter from time to time, or to repeal, all acts of incorporation other than municipal, and it is held that a corporation which has accepted an amendment to its charter since 1868 is under this provision. The large number of acts of incorporation passed at every session of the legislature shows the facility with which franchises are obtained, notwithstanding there is a general corporation law and a provision in the article of the constitution quoted that "corporations may be formed under general laws, but shall not be created by special act, except for municipal purposes and in cases where, in the judgment of the legislature, the object of the corporation cannot be obtained under general laws." Whether the reservation in this article of the constitution would place charters granted by the legislature upon the same legal footing with charters with the right to diminish or impair the rights granted without the consent of the grantees, it is unnecessary to decide, but it would not give to the legislature power to disturb vested rights acquired in pursuance of a charter granted or former act of the legislature. A state legislature cannot impair the obligation of a contract or disturb vested rights in violation of the constitution of the United States. With the incorporators the legislature may deal; but when third parties, putting faith in an act of the legislature, have made contracts and acquired rights of property, the legislature cannot disturb them. Therefore the act of 1897, referred to, would be declared unconstitutional and inoperative if attempted to be applied to the mortgage made or the bonds issued in 1886 in pursuance of the act of the legislature of 1883. It is well settled that the laws which are in force at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of the contract as much as if they were incorporated in

its terms. This principle embraces the acts which affect its validity, construction, discharge, and enforcement, or the remedies under the contract. Von Hoffman v. City of Quincy, 4 Wall. 535; Walker v. Whitehead, 16 Wall. 314; Barnitz v. Beverly, 163 U. S. 118, 16 Sup. Ct. 1042; Edwards v. Kearzey, 96 U. S. 595. Notwithstanding the constitutional provisions in article 8, before quoted, and a general railroad law in the state, it appears from the acts of the legislature—the only source from which courts can derive any authentic evidence of a state policy as to corporations (Swann v. Swann, 21 Fed. 301)—parties building or buying railroads in North Carolina almost invariably go to the legislature for a new franchise, it is reasonable to suppose that a purchaser at a sale of this property, either as an entirety or in divisions, would apply to that body for a new charter. The act of 1897, subject to all these objections and others, should not, therefore, "chill the sale," as said by the circuit judge, or in any way affect it; nor should its passage have any weight with a court of equity in determining the best method of sale for this important property. Lobbyists should not be permitted to affect pending litigation, especially when they are inadvertent to constitutional provisions.

Courts of equity do not make contracts. There can be no doubt about the principle contended for by appellees that under a deed of trust containing a power of sale application may be made to the court to decree a sale, but a court of equity will follow, as nearly as may be, the provisions of the deed itself. The application to the court does not change the contract made by the parties themselves, and, upon this principle that the parties have so contracted, preference is given to the holders of the coupons to the bonds themselves. To hold otherwise is, in effect, to hold that the court may do what the lawmaking power cannot,—impair the obligation of a contract.

The original purpose of this railroad seems to have been to establish railroad communication between Fayetteville, at the head of navigation on the Cape Fear river, and the coal beds of Chatham county, near the center, and not in the western part of the state, as is erroneously stated. From this original purpose the Cape Fear & Yadkin Valley Railroad has been formed by additions from time to time. At the date of the mortgage (1886) only that part known as "Division A" had been built, and the mortgage was on all the road then in esse to secure this series of bonds. I agree with the learned circuit judge that the usual and the best mode of ascertaining the value of property is by public auction, and, where the parties have by their own deed and contract established a method of sale, a court of equity should follow that method prescribed by the parties themselves. Expert testimony and estimates may be biased and influenced by circumstances of which the court can know nothing. They do not make values. The safest test of the value of property is what it will bring in the open market. The parties contracted as to how this property should be sold, and how its value should be ascertained, and that contract seems to me to be binding even on a court of equity. The mortgage provides that the property shall be sold "first as an entirety, and in case that no acceptable bidder is forth-

coming for the said property as an entirety, then the said trustee shall proceed to sell separately the three divisions of the road hereinbefore made, and upon which the several series of bonds are hereby made or intended to be made first liens." Who is to determine what is an acceptable bid for the road as an entirety is left in doubt, and there is no means for determining how this question was to be settled. Is the bid to be acceptable to the trustee? To the bondholders? If so, to which class, or to the party of the first part? Or was it to be acceptable to all of these parties? A satisfactory answer to either question is not possible. Disregarding, then, this language, doubtful and ambiguous, the mortgage provides for the sale of the property first as an entirety and then by divisions, the bid to be accepted that realizes the best price for the parties directly interested in the property on which they hold the first lien,—what is known among auctioneers (an every-day practice at public sales) as an upset sale. The sole object of the court, keeping in view well-established principles, must be to secure to the parties in this cause the best result for the property in which they have an interest. This, it seems to me, will be accomplished by following the contract made by the parties themselves, and not invoking any of the extraordinary or extrajudicial powers of a court of equity.

Where there is a well-established rule of property in a state, the courts of the United States will follow that rule. Barber v. Railway Co., 166 U. S. 83, 17 Sup. Ct. 488, and cases cited. The rule in North Carolina in regard to mortgages and deeds of trust is well settled by a number of decisions of the supreme court of that state. The doctrine that a mortgage is a mere incident to the debt has never been favorably considered by the courts of the state, but these courts hold, with a rare exception, to the better doctrine that it is a direct appropriation of the mortgaged property to the payment of the debt, and a direct proceeding may be maintained to subject the property to the payment of the debt for which it is appropriated as a security. Murphy v. McNeil, 82 N. C. 221; Capehart v. Dettrick, 91 N. C. 344. It is equally as well settled that the grantor in a mortgage or deed of trust cannot, after execution, vary in any way the trust. Ingram v. Kirkpatrick, 41 N. C. 463; Hogan v. Strayhorn, 65 N. C. 279.

Applying these well-established rules of property to the case under consideration, the conclusion must be that the mortgage of 1886 was an appropriation of the road then constructed from Greensboro to the South Carolina line, known as "Division A," to the payment of the series of the bonds known as the "A" bonds; and of Division B, from Greensboro to Mt. Airy, not completed, to the payment of the series of bonds known as the "B" bonds; and Division C, from Fayetteville to Wilmington, not commenced, to the payment of the series of bonds known as the "Series C" bonds; and that after the execution of this mortgage neither the railroad company, the trustee, nor the legislature could vary the trust. Three years after, the debt being still unpaid, there remained in the company only an equity of redemption as to this property to be appropriated to the payment of the debt secured by the mortgage of 1889. Registration being legal notice, those claiming under this latter mortgage took with notice of the provi-

sions of the mortgage of 1886, and it appears from the mortgage itself they had actual knowledge, and were well advised as to all of its provisions. They cannot now be heard to vary any of the trusts, remedies, or rights under the prior mortgage. Equity may grant them a hearing as to the distribution of the surplus funds after the debts secured by the prior mortgage are satisfied, and as to the best method of realizing the largest returns from a sale of the property, but they should not be heard to question the validity of prior liens subject to which they accepted a second lien. Bronson v. Railroad Co., 2 Wall. 283.

The mortgage provided for a distribution of the proceeds in the event of sale in language easily understood and constituting a part of the contract. The provisions are as follows:

"It [trustee] shall apply the residue of the proceeds of said sale [after paying certain expenses] to the payment, first, to the interest due on said bonds outstanding secured or intended to be secured hereby; and, secondly, to the principal of said bonds in full, if the said purchase money, after deducting the expenses above mentioned, be sufficient; but, if not, then pro rata."

"Pro rata" here means that creditors are to be paid or to prorate with those of the same class, and the holders of A bonds would be paid out of the funds arising out of the sale of the road as an entirety according to the bids for the property especially appropriated as a security for this series of bonds; and this rule would apply to the other divisions of the road, and the payment of the bonds for which they are appropriated as a security. There should therefore be a sale of the road first as an entirety, and then by divisions. It is so provided in the contract. With great deference, I dissent.